UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------X
T-MOBILE NORTHEAST LLC,

               Plaintiff,

       -against-

THE TOWN OF ISLIP and the PLANNING
BOARD OF THE TOWN OF ISLIP,

               Defendants.
----------------------------------------------------X

**FILED**
**CLERK**

9/21/2012 8:37 am

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**MEMORANDUM OF
DECISION AND ORDER**
10-CV-692 (ADS) (WDW)

<u>**APPEARANCES:**</u>

**Re, Nielson, Huber & Coughlin, LLP**
Attorneys for the plaintiff
36 North New York Avenue
Huntington, NY 11743
      By:  John Coughlin, Esq.
           Lawrence C. Re, Esq., Of Counsel

**Snyder & Snyder, LLP**
Attorneys for the plaintiff
94 White Plains Road
Tarrytown, NY 10591
      By:  Megan F. Carroll, Esq., Of Counsel

**Rosenberg Calica & Birney LLP**
Attorneys for the defendants
100 Garden City Plaza
Garden City, NY 11530
      By:  Edward M. Ross, Esq.
           Judah Serfaty, Esq., Of Counsel


**SPATT, District Judge**.

      In this case, the plaintiff T-Mobile Northeast LLC ("T-Mobile") alleges that the Town of

Islip ("the Town") and the Planning Board of the Town of Islip ("the Board" and together with

the Town, "the Defendants") denied its request for a special use permit to construct a public

utility wireless telecommunication facility, in violation of the Telecommunications Act of 1996

(the "TCA"), 47 U.S.C. § 332(c) and Article 78 of the New York Civil Procedure Law and Rules.   Presently before the Court are T-Mobile's motion for summary judgment and the Defendants' cross-motion for summary judgment.  For the reasons set forth below, the Court denies T-Mobile's motion for summary judgment and grants the Defendants' cross-motion for summary judgment.

## I.  BACKGROUND

Unless otherwise indicated, the following constitutes the undisputed facts of the case derived from the administrative record in this case and the parties' submissions, accompanying affidavits and Rule 56.1 Statements.

### A.  The Parties

T-Mobile is a "telecommunications carrier" that is considered a public utility for zoning purposes.  See Cellular Tel. Co. v. Rosenberg, 82 N.Y.2d 364, 371–72, 604 N.Y.S.2d 895, 624 N.E.2d 990 (1993).  T-Mobile is a wholly owned subsidiary of T-Mobile USA, Inc., and uses licenses issued to T-Mobile USA, Inc. by the Federal Communications Commission ("FCC").  These licenses were issued to T-Mobile, USA, Inc. and its affiliates to provide personal wireless services, as defined under federal law, within the state of New York, including Suffolk County and the Town of Islip.

The defendant Town of Islip delegates its local zoning decisions regarding the siting and construction of wireless communications facilities to the defendant Board.  Article 68 of the Code of the Town of Islip (the "Town Code") contains a provision that addresses the regulation of the siting and installation of wireless telecommunications facilities.  See Town Code, Chapter 68, Zoning, Article XXXIV, Miscellaneous Provisions, § 68-420.1 "Wireless communications facilities; amateur radio towers; satellite antenna."  Pursuant to Town Code §68-420.1A(4)(a), all

applications for siting and installing wireless communications facilities, regardless of location, are subject to both site plan approval and special permit approval by the Board.

## B.  T-Mobile's Network

As T-Mobile explains, to provide wireless service, T-Mobile creates a network of individual but interconnected "cell sites", which are antenna facilities consisting of radio antennas and equipment that sends and receives radio signals to and from customers' portable wireless communications handsets and mobile telephones.  T-Mobile's wireless antennas receive and transmit low power radio signals from wireless telephones and relay the signals through the attached electronic equipment into the "land line" telephone infrastructure enabling wireless calls to be routed anywhere in the world.  (Pl.'s 56.1 Stmt., ¶ 6.)

Each cell site serves a small geographic area and has height requirements that vary according to local topography, vegetation, and the configuration of existing structures.  (Id., ¶ 7.) According to T-Mobile, due to federal licensing regulations, each cell site has limited transmission power and a limited number of channels thereby restricting the number of telephone calls the cell site can accommodate.  (Id., ¶ 8.)  If there are too few cell sites or if cell sites are located too far apart, wireless telephone users serviced by T-Mobile may experience what T-Mobile defines as "unreliable service", which includes "disconnection of calls and static and difficulty placing and maintaining calls."  (Id., ¶ 9.)

## C.  T-Mobile's Application

T-Mobile purports to have identified a significant service gap in Bayport, which is a hamlet in the Town of Islip.  To fill that gap, T-Mobile claims it must build a monopole or tower, affix to it public utility wireless telecommunications antennas and install related equipment on

the ground (hereinafter "Proposed Facility").  The following description of the Proposed Facility

is undisputed:

> - The Proposed Facility would consist of a 120 foot brown monopole and ground-based equipment on a concrete pad and set within a 13 feet 6 inches by 28 feet 10 inches fenced communications compound.  Six public utility wireless telecommunications antennas would be concealed with the monopole. The Proposed Facility would be surrounded by 8-foot tall shrubs around the perimeter of the compound to screen the equipment.

After initial consultation with the Planning Department, T-Mobile found an area to build

the Proposed Facility within the Suffolk County Girls Scouts Camp Edey located at 1500

Lakeview Avenue, Bayport, New York (hereinafter "Premises" or "Camp Edey"), which is

located in a Residential AAA zoning district.  Camp Edey is a heavily wooded property spanning

approximately 94 acres, which is surrounded by a camp ground, nature preserve, and residential

uses.  Approximately 125 feet from the site is the Sans Souci Nature Preserve and the Sans Souci

Lakes.

According to T-Mobile, although the Premises is residentially zoned, it was chosen as the

most favorable site inasmuch as it achieves an optimal balance between meeting T-Mobile's

coverage needs and minimizing impact on the surrounding area because the Premises is large

enough so that the Proposed Facility can be located far from residences and the Premises

primarily consists of densely wooded land, which serves as a natural visual buffer for the

Proposed Facility.

The Town of Islip regulates the approval of wireless telecommunication facilities within

its borders through Article 68 of the Town Code.  Pursuant to Section 68-420.1 of the Town

Code, any construction of a wireless telecommunications facility requires a special use permit.

Section 68-420.1(A)(1) states the "Purpose" of the ordinance as follows:

In recognition of advancing technology and the increased demand and need for wireless communications towers and facilities, the Town of Islip hereby determines that it is in the public interest to regulate the siting and installation of such facilities within the Town in order to protect the public health, safety and welfare. Therefore, the Board hereby determines to establish general guidelines for the siting of wireless communications towers that reflect two preferences: that wireless service providers utilize existing towers, buildings and structures to minimize the construction of new towers, and that wireless communications facilities are located in commercial and industrial districts rather than in residential districts. In furtherance of these objectives, due consideration shall be given to the Town's Comprehensive Plan, existing land uses and development, environmentally sensitive areas, aesthetics and other appropriate factors in approving sites for the location of towers and/or facilities.

Section 68-420.1(A)(4) provides specific objective requirements for the proposed wireless telecommunications facilities that differ based on whether the proposed facility is located in an area zoned as Residential, § 68-420.1(A)(4)(a), Commercial, § 68-420.1(A)(4)(b), Historic district, § 68-420.1(A)(4)(c), or Park and scenic vistas, § 68-420.1(A)(4)(d).

Because the Premises was zoned Residential AAA, the objective requirements were set forth in § 68-480.1(A)(4)(a), which provides:

Wireless communications facilities located in residential zoning districts are subject to site plan approval and special permit approval from the Planning Board, and must meet the following requirements:
(1) Wireless communications facilities on buildings shall be no higher than 20 feet above the maximum permitted height of the principal structure.
(2) A tower base shall be set back from the property line by a minimum distance of 110% of the height of the tower.

In addition to these objective requirements for constructing a facility in a Residential zone, there are a number of generally applicable provisions relating to collocation, design, removal, and applicable requirements. See § 68-420.1(A)(5)-(A)(8). Only the section relating to

the "Design" of the proposed facility is relevant to the instant litigation. The parties agree that the portion of these provisions applicable to the Proposed Facility were as follows:

> (a) The tower shall be designed in such a manner as to minimize any visual impacts pursuant to the Planning Board;
> (c) Buildings accessory to wireless communications facilities shall be screened, landscaped and designed to minimize any visual impacts pursuant to the Planning Board;
> (d) The base area shall be surrounded by a six-foot high fence. The surrounding fence shall be screened by a continuous row of evergreen trees of at least six feet in height and planted five foot on center at time of installation;
> (f) A tower shall not be lighted unless required by the FAA.

Finally, section 68-420.1(A)(9) sets forth the following additional factors that the Board may consider in determining whether to grant a special use permit to construct a wireless communication facility:

> (9) Considerations
> (a) Priorities
>> [1] The Board may give priority to application for location on an existing structure or building.
>> [2] The Board may give priority to applications for collocation.
>> [3] The Board may give priority to a single application for multi-antenna proposals.
> (b) Other Considerations
>> [1] The minimum height necessary to render adequate service.
>> [2] Proximity to residential districts and other structures.
>> [3] Nature of existing or proposed uses of adjacent property.
>> [4] Site and/or surrounding topography.
>> [5] Surrounding tree coverage and foliage.
>> [6] Design of tower, in particular the characteristics that have the effect of reducing or eliminating visual obtrusiveness.
>> [7] Availability of suitable existing towers and structures.
>> [8] Proposed ingress and egress.

(c) The Board may waive or reduce the burden on the applicant of one or more of these criteria if it concludes that the goals of this section are better served thereby.

On September 28, 2007, T-Mobile submitted an "Application for Modification of Land Usage" to the Planning Department seeking a special permit and modification of site plan approval to construct the Proposed Facility at the Premises ("the Application").

As part of the initial application, T-Mobile submitted the following documents:

(1) Affidavit of Radio Frequency (hereinafter "RF") Engineer Regarding Physical Need of Sean Reid, an RF Engineer for T-Mobile, stating the proposed antennae must be affixed at least as high as 120-feet in order to ensure reliable service for T-Mobile users in the vicinity of the site (R. at 30-32);

(2) Affidavit of Good Faith Effort to Colocate and Alternative Sites Considered, sworn to by James Korwan, the Vice President of JP&C Consulting Group, Inc., a site acquisition consulting firm representing T-Mobile in the Long Island market, stating that it had been unable to find a suitable location for collocation; Bayport had failed to respond to T-Mobile's request to identify municipal buildings that may be an option; that it had considered a number of properties owned by Suffolk County that the County refused to lease; and that potentially suitable properties in commercial areas were ruled out because they were closer to residences to the Premises (R. at 37-39);

(3) a One-Mile Radius Visual Study (hereinafter "One-Mile Study") prepared by Freudenthal & Elkowitz Consulting Group, Inc. (hereinafter "Freudenthal"), which relied on the results of a "crane test" in order to determine where, within a one-mile radius of the Proposed Facility, it would be visible (R. 766-777). The One-Mile Study concluded that the Proposed Facility would be at least partially visible from only three locations within a one-mile radius, and that all additional areas within the one-mile radius had no visibility due to vegetation and existing structures. (R. at 770.)

On July 29, 2008, T-Mobile submitted additional materials to the Planning Department including: (1) maps reflecting all of the existing, approved, and proposed facilities of telecommunications carriers other than T-Mobile within five miles of the Proposed Facility;

(2) information regarding property owners that live within 200 feet of the perimeter of the Premises; and (3) revised site plans.

**D.  The Hearing on T-Mobile's Special Use Permit Application**

On August 7, 2008, the Board held a public hearing on the Application ("the Hearing"). At the Hearing, T-Mobile presented the live testimony of five expert witnesses.

First, T-Mobile offered the testimony of Neil MacDonald ("MacDonald"), a licensed New York State Registered Architect and partner in the firm of William F. Collins, AIA Architects, LLP, who testified that the Proposed Facility:  was designed to minimize its intrusiveness; would be located 409 feet west of the nearest residential property in compliance with the setback requirements in the Town Code; included a 120-foot monopole designed as a "stealth structure" where the antennae were contained within the pole, and which would be painted brown to "blend in" with the surrounding trees and forests; and that the Proposed Facility would be surrounded by an opaque PVC vinyl fence, which in turn would be surrounded by landscaping to further screen the equipment.

In response to questions from the Board, MacDonald confirmed that other carriers would be able to collocate on the monopole and that there were no other existing structures within the fall zone that could be impacted if the tower fell, a probability that MacDonald testified was unlikely given that the pole was designed in compliance with New York State wind loading criteria.  In addition, MacDonald stated that the estimated average height of the surrounding trees was 60 feet, (R. at 527), and did not deny that the monopole was visible, and would be more visible in the wintertime.  Rather, MacDonald stated, because the pole was brown, "in the winter you may see more of a brown pole".  (R. at 526.)

Erin Duffy ("Duffy"), a project manager from Freudenthal, testified about the aesthetic and environmental impact of the Proposed Facility, and presented the results of a Planning, Zoning and Visual Impact Analysis ("the Visual Impact Analysis"). Included with Duffy's report were photographs of the existing conditions at the Premises, as well as photographic simulations of how the Premises might appear with the addition of T–Mobile's Proposed Facility. After discussing the surrounding area and design of the facility and the photosimulations, Duffy concluded that, based on the surrounding area and design of the facility, that:

> "[t]he Proposed Facility will be visible from certain vantage points; however, there are many locations throughout the surrounding neighborhoods from which the proposed facility would not be visible. Moreover, given the proposed design of the facility, antennas concealed within a brown unipole, and the surrounding mature vegetation, the proposed facility in many areas will blend with the horizon. As such the overall potential visual impact would not be significant."

(R. at 541.) Duffy also testified that there would be no negative impacts on the surrounding wildlife or wetlands. Duffy further concluded that "the installation on the proposed facility will not result in substantial changes to the physical characteristics in the area, nor will it result in significant adverse impacts to the neighborhood character or the environmental conditions of the area." (R. at 542.)

Mitchell K. Baum ("Baum"), a RF engineer from T-Mobile, testified as to T-Mobile's need for the Proposed Facility, and submitted an Affidavit of Radio Frequency Engineer. Attached to the Baum Affidavit were maps that depicted T-Mobile's existing coverage and the current gap in service coverage, for both in-building and in-vehicle, as well as the coverage that would be afforded to residents of Bayport and current and future customers of T-Mobile by the Proposed Facility.

Finally, Michael Lynch ("Lynch"), a New York State certified commercial real estate appraiser, testified that given the design of the Proposed Facility, its setting in a heavily wooded pine evergreen-type parcel, and its distance to the nearest residences, the Proposed Facility would not result in any adverse effects to nearby property values. In addition, Lynch prepared and submitted a report (hereinafter "Real Estate Report") to the Planning Board at the Hearing, purporting to show that, based on studies of property values in other Long Island communities where similar towers were constructed, no correlation had been found between the presence of wireless telecommunication facilities and declining property values in the Long Island residential communities studied.

Also testifying in support of the application was Yvonne Grant, the president of the Girl Scouts of Suffolk County. Grant testified about the financial stability the Proposed Facility would provide to the Girl Scouts, as well as the fact that it had received strong approval from the Girl Scout board. When questioned by the Planning Board as to whether girls play in the area of the Proposed Facility, Grant answered, "To our knowledge no. The girls would not be playing in the woods themselves or in this area where the pole is to be located." (R. at 575.) At the Hearing, when asked by the Planning Board if the Girl Scouts would be willing to make the area around the pole a prohibited area, Grant responded, "Absolutely." (Id.)

Prior to the Hearing, T-Mobile became aware of a number of concerns in the community regarding the placement of the Proposed Facility in Camp Edey. In response, T-Mobile submitted the following additional documents to address these concerns:

- a letter from the New York State Office of Parks, Recreation and Historic Preservation ("SHPO"), dated January 4, 2008, finding that T-Mobile's project would have no effect upon cultural resources in or eligible for inclusion in the National Registers of Historic Places. (R. at 507–08; 534; 824.)

- a letter of Determination of No Hazard to Air Navigation (hereinafter "No Hazard Letter") from the Federal Aviation Administration ("FAA"), dated January 4, 2008, stating they had conducted an aeronautical study, which revealed that the structure would not exceed obstruction standards and would not be a hazard to air navigation. In addition, marking and lighting were not found to be necessary for aviation safety. (R. at 820–22.)

- a Letter of Non-Jurisdiction from the New York State Department of Environmental Conservation Division of Environmental Permits dated May 19, 2008, stating that the Department of Environmental Conservation (DEC) had determined that T-Mobile's Proposed Facility was more than 100 feet from regulated freshwater wetlands, and therefore an additional permit pursuant to the Freshwater Wetlands Act (Article 24) and its implementing regulations (6 NYCRR Part 663) was not required. (R. at 45–47; 823.)

A representative from the Bayport Civic Association, Robert Draffin, and eleven residents testified in opposition to the Application. Draffin read into the record a letter he had written to the Board on behalf of the Bayport Civic Association, wherein he objected to the Application on the following grounds: (1) the Premises was located in a Residential AAA zone and there was no indication that T-Mobile had engaged in a "serious effort" to collocate: (2) the Proposed Facility would be harmful to the environment insofar as (a) Camp Edey was identified in the Town's 2007 Green's Creek and Brown's River Management Plan as a "nature preserve" and the "the clear-cutting of hundreds of square feet of this pristine land for a 120-foot structure runs counter to the intentions set forth the Towner's own watershed protection plain" and (b) Camp Edey is in the flight path for migratory birds and therefore the tower would resulted in numerous "Birdkills"; (3) the Proposed Facility lies within the flight path of the Bayport Aerodome, which has no tower and unlit, grass runways, and where often times "open cockpit aircraft in excess of 60 years old without avionics" fly in inclement weather conditions, and therefore creates a "needless risk that should be avoided at all costs"; (4) the size of the tower

adversely affects the nature and character of the hamlet because the tower is "400% to 600% taller than anything else existing in Bayport and would truly stand out like a sore thumb" and "will forever change the skyline that we enjoy when looking over the Sans Souci Preserve"; and (5) the detrimental health effects of cell tower radiation on humans, and particularly on children. (R. at 134–35.)

Draffin also submitted into the record: two newspaper articles objecting to the Proposed Facility, one of which was written by Draffin; two newspaper articles objecting to the proposed towers in other Long Island towns; and two letters from Bayport citizens objecting to the Proposed Facility. One of the resident letters objected to the Proposed Facility on aesthetic grounds and the negative impact on the nature and character of the community. In particular, the resident highlighted the efforts to "preserve Bayport's 'heritage' with organized beautification efforts", and argued that the placing the Proposed Facility in Camp Edey would "destroy" the "essence of these fine efforts". (R. 132–133.)

At the Hearing, the testimony of the other eleven residents focused predominantly on the purported detrimental effects of radiation from cell phone towers on humans and wildlife. In addition, residents questioned the adequacy of T-Mobile's visual impact analysis and testified about the negative aesthetic impact of the proposed tower on their enjoyment of their view of the nearby Sans Souci Nature Preserve, as well as the property values of their home; the incompatibility of the Proposed Facility with the nature and character of the area; safety concerns with respect to children who play in the area near the Proposed Facility, regardless of whether they are trespassing; and the safety of pilots flying antique planes from the Bayport Aerodome.

At the conclusion of the Hearing, Sean Colgan ("Colgan"), Senior Planner for the Town of Islip Planning Department, testified on behalf of the Planning Department's preliminary

findings regarding the Proposed Facility, during which he identified a number of concerns relating to the aesthetic impact of the Proposed Facility; the impact on wildlife in the area; whether there were less intrusive options given the fact that the proposed tower would provided coverage to "a vast amount of open space where service coverage is generally not needed"; and the possibility of alternative sites. (R. at 668–670.)

### E. Post-Hearing Submissions

Subsequent to the Hearing, the record was supplemented by both T-Mobile and members of the community. In response to requests by the Planning Department, T-Mobile conducted a second crane test showing the visual impact of the Proposed Facility in the winter during "leaf-off" conditions ("the 'Leaf-Off' Analysis"). The results of the "Leaf-Off" Analysis indicated that the Proposed Facility "would be partially visible from a few points along the residential streets to the east of the proposed facility location" and that "the crane was partially visible when looking north from Montauk Highway across the Sans Souci Lakes". (R. at 388.) Because the "Leaf-Off" Analysis found that "[t]he visibility of the Proposed Facility would be limited to an area within approximately one-quarter mile of the Proposed Facility", and that "the design of the facility . . . is such that potential visual impacts would be further mitigated", the "Leaf-Off" Analysis ultimately concluded that "the Proposed Facility would not result in significant adverse visual impacts. (R. at 392.)

In addition, T-Mobile submitted supplemental affidavits and propagation maps reflecting that collocation on four additional sites would not remedy the coverage gap, nor would placing a 140-foot antenna on a building in an Industrial Area recommended by the Planning Department staff. As to the aviation concerns, T-Mobile submitted a letter from the Town Department of Aviation, concurring with the FAA's determination that the Proposed Facility did not pose a

safety risk.  However, in an abundance of caution, the Town's Aviation Department recommended adding a red beacon light on the tower.

With respect to members of the community, the record was supplemented with a number of letter and articles addressing the health concerns raised by cell towers as well as other safety concerns; and letters from long-time residents and a member of the New York State Assembly on behalf of "many constituents" objecting to the negative aesthetic impact of the tower on the scenic views and its negative impact on the nature and character of the community.

## F.  The Staff Report

After reviewing T-Mobile's initial application, as well as the additional documents and information T-Mobile submitted after the Hearing, the staff of the Planning Department prepared a report for the Board, in which it recommended granting the Application ("the Staff Report"). The relevant portions of the Staff Report are as follows.  First, the Staff Report noted that options for collocation, siting towers in commercial and industrial districts, and siting the tower in a different residential district were all reviewed and rejected as insufficient to service the coverage gap.  The Staff Report then goes on to address five areas of concern:  (1) the nature and character of the area; (2) aviation safety; (3) environmental impacts; (4) the amount of coverage gained; and (5) the visual impact of the Proposed Facility.  The Staff Report concluded that T-Mobile's supplemental submissions had satisfied their concerns, and recommended that the Board approve the Application.  The Staff Report summarized their rationale as follows:

> • The applicant has demonstrated that no structure or building can accommodate the applicant's proposed antenna that provides similar coverage to the proposed tower.
> • The surrounding tree foliage, albeit not completely, blocks much of the view of tower from the residences *nearby*.
> • There has been expressed interest from other carriers for collocation on this tower, thereby potentially eliminating the need for multiple towers in the area.

> • The tower has been situated and designed to reduce or eliminate visual obtrusiveness.
> • A significant coverage gap will be serviced with the installation of this tower.
> • While it is a preference that wireless communications facilities be located in commercial/industrial districts rather than residential, it is not a requirement.
> • Given the nature and character of the area, it would be difficult to site this tower in an area that would be less obtrusive. In that regards, the staff believes the proposed facility is the least obtrusive means for T-Mobile to provide reliable service in this area and that this is the most acceptable location for the proposed tower in accordance with the Town Code and limitations of the Federal Telecommunications Act.

(R. at 681–82.)

## G.  The Second Hearing

On January 21, 2010, the Board held a second public hearing (the "Decision Hearing") in which the Board voted to deny T-Mobile's application for the Proposed Facility. At the Decision Hearing, T-Mobile's counsel summarized the history of the application, the prior hearing, and the exchange of correspondences between T-Mobile and the Planning Department.  Specifically, T-Mobile indicated that they had considered and ruled out all of the alternative sites proposed by the Planning Department.  In addition, T-Mobile provided the results of the "Leaf-Off" Analysis, which T-Mobile stated "showed that because of the tree[] buffer there would be very little impact to the surrounding area".  (R. at 688.)

On behalf of the Bayport Civic Association, Draffin again spoke out in opposition to T-Mobile's application.  Draffin disputed that the residents had been notified of the second crane test, but stated that a resident who noticed that the second crane test was taking place took photographs.  According to Draffin, these three photographs demonstrate that the proposed tower would be widely visible, and undermined the accuracy of the photographs provided by T-Mobile. In addition, Draffin submitted a letter to the editor that he had written objecting to the Proposed

15

Facility; a letter from Draffin to the Board objecting to the fact that he had not been notified of the second crane test; denials by seven different planning boards of T-Mobile siting applications; a letter from George Mitchell on behalf of the Bayport Aerodome Society expressing safety concerns; and a letter from a relative of the first director of Camp Edey. Draffin also referenced a petition signed by 300 residents in opposition to the Proposed Facility, however that petition was not included as part of the record.

Subsequently, Colgan, on behalf of the Planning Department, read the Staff Report into the record. Two Board members then spoke out in opposition to the Application, arguing that the Proposed Facility would have a negative aesthetic impact on the community, and that T-Mobile had failed to show that a significant amount of coverage would be gained from the Proposed Facility.

## H. The Decision and the Instant Action

In a written decision dated January 22, 2010, the Board denied the Application (the "Denial") based on the following conclusions:

> 1. The applicant failed to establish a need for service within the coverage gap given the abundance of passive areas where wireless communications service is not needed.
> 2. The Planning Board determined the proposed 120' tower was not in keeping with the nature and character of the area.
> 3. The Planning Board determined that the proposed tower adversely impacted the park uses in the area which are permitted in a residential zone.
> 4. The safety concerns raised regarding the proposed tower's proximity to the Bayport Aerodrome still remained.
> 5. There were significant adverse aesthetic impacts to nearby residential properties.

(R. at 867.)

On February 17, 2010, T-Mobile filed the instant complaint asserting that the Denial violated Section 332(c)(7)(B)(iv) of the TCA because it was improperly based on the health risks

from the Proposed Facility; was not supported by substantial evidence in violation of the Telecommunications Act of 1996, 47 U.S.C. § 332(c); violated Article 78 of the New York Civil Procedure Law and Rules because it was not supported by substantial evidence; was an abuse of discretion; and was arbitrary and capricious. T-Mobile now moves for summary judgment on all three causes of action. The Defendants cross-move for summary judgment on the same claims.

## II. DISCUSSION

### A. Legal Standard for Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Globecon Group, LLC v. Hartford Fire Ins. Co., 434 F.3d 165, 170 (2d Cir. 2006). In determining whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995) (citing United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962) (per curiam), and Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 465 (2d Cir. 1989)).

If the moving party meets its initial burden of demonstrating the absence of a disputed issue of material fact, the burden shifts to the nonmoving party to present "specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). The nonmoving party may not then rely solely on "conclusory allegations or unsubstantiated speculation" in order to defeat a motion for summary judgment. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998). If the evidence

favoring the nonmoving party is "merely colorable . . . or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477, U.S. 242, 249–50, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (internal citations omitted).

**B.  The Telecommunications Act**

The Telecommunications Act of 1996 ("TCA") is "an omnibus overhaul of the federal regulation of communications companies," the purpose of which is to "provide for a pro-competitive, de-regulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services ... by opening all telecommunications markets to competition . . . ." Sprint Spectrum, L.P. v. Willoth, 176 F.3d 630, 637 (2d Cir. 1999) (quoting H.R. Conf. Rep. No. 104–458, at 113 (1996), reprinted in 1996 U.S.C.C.A.N. 124, 124).  "One of the means by which [Congress] sought to accomplish these goals was reduction of the impediments imposed by local governments upon the installation of facilities for wireless communications, such as antenna towers." City of Rancho Palos Verdes, Cal. v. Abrams, 544 U.S. 113, 115, 125 S. Ct. 1453, 161 L. Ed. 2d 316 (2005).  Thus, Congress amended the TCA to include section 332(c)(7), which "preserved the authority of state and local governments over zoning and land use issues, but imposed limitations on that authority."  New York SMSA Ltd. P'ship v. Town of Clarkstown, 612 F.3d 97, 101 (2d Cir. 2010) (citing 47 U.S.C. § 332(c)(7)).

Pursuant to section 332(c)(7), local governments retain authority over "decisions regarding the placement, construction, and modification of personal wireless service facilities", § 332(c)(7)(A), but may not "unreasonably discriminate among providers of functionally equivalent services," § 332(c)(7)(B)(i)(I), take actions that "prohibit or have the effect of prohibiting the provision of personal wireless services," § 332(c)(7)(B)(i)(II), or deny a request

"on the basis of the environmental effects of radio frequency emissions," § 332(c)(7)(B)(iv). In addition, the TCA establishes procedural requirements that must be met when evaluating an application to construct a wireless facility. For example, the denial of a request to construct a wireless facility must be "in writing and supported by substantial evidence" in the record. 47 U.S.C. § 332(c)(7)(B)(iii).

**C.  As to T-Mobile's Claim that the Defendants Violated the TCA by Denying the Application Based on Health Concerns**

The TCA expressly prohibits a local zoning board from denying an application that is otherwise compliant with FCC emissions regulations "on the basis of the environmental effects of radio frequency emissions".  47 U.S.C. § 332(c)(7)(B)(iv).  "Environmental effects within the meaning of the provision include health concerns about the biological effects of RF radiation." T-Mobile Northeast LLC v. Town of Ramapo, 701 F. Supp. 2d 446, 460 (S.D.N.Y. 2009).  Here, it is undisputed that the Proposed Facility would be in compliance with FCC emissions regulations.

At the Hearing, the Board recognized the FCC's exclusive jurisdiction concerning potential or perceived health risks, and repeatedly stated that testimony regarding such concerns was not relevant to T-Mobile's application.  However, the Board did encourage residents to further comment, submit additional materials, and contact their elected representatives regarding the perceived health effects.  (R. at 624–25, 627–29.)  Indeed, a significant amount of the resident testimony at the Hearing and subsequent submissions were focused on perceived detrimental health effects of the Proposed Facility.  (See, e.g., R. at 64–67, 68–71, 605–09, 621, 638, 664.)

However, the mere fact that members of the community raised health concerns does not violate the TCA.  See Cellular Tel. Co. v. Town of Oyster Bay, 166 F.3d 490, 495 (2d Cir.

1999).  Rather, the TCA is violated when a zoning board's denial of an application for a wireless facility is based in part on those concerns.  Town of Ramapo, 701 F. Supp. 2d at 460 ("[A]ny decision actually based on environmental effects is a violation, whether other legitimate reasons factored into the decision or not.").  Where, as here, the Board did not explicitly include environmental or health concerns as a basis for denying the Application, but "testimony is almost exclusively directed to health effects", the Second Circuit has directed that "there must be substantial evidence of some legitimate reason for rejecting the applications to avoid the conclusion that the denials were based on the impermissible health effects ground."  Town of Oyster Bay, 166 F.3d at 495.  As set forth below, because the Court finds that the Board's Denial of T-Mobile's Application was supported by substantial evidence on the legitimate grounds of aesthetic concerns and the need for service, the Court finds that the Defendants did not violate section 332(c)(7)(B)(iv) of the TCA.  Accordingly, T-Mobile's motion for summary judgment on its claim that the Defendants violated 47 U.S.C. § 332(c)(7)(B)(iv) is denied and the Defendants' cross-motion for summary judgment on this claim is granted.

**D.  As to T-Mobile's Claim that the Defendants Violated the TCA Because the Denial was Not Supported by Substantial Evidence**

Pursuant to TCA section 332(c)(7)(B)(iii):

> [a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record

47 U.S.C. § 332(c)(7)(B)(iii). To determine whether a denial was supported by substantial evidence, courts "must employ 'the traditional standard used for judicial review of agency actions.'"  Cellular Tel. Co. v. Town of Oyster Bay, 166 F.3d 490, 494 (2d Cir. 1999) (quoting H.R. Conf. No. 104-458, at 208 (1996), reprinted in 1996 U.S.C.C.A.N. 124, 223).  Substantial

evidence requires "less than a preponderance, but more than a scintilla of evidence [and] 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Id. (quoting Universal Camera v. NLRB, 340 U.S. 474, 477, 71 S. Ct. 456, 95 L. Ed. 456 (1951)). "Whether an administrative agency determination is shored up by substantial evidence is a question of law to be decided by the courts." Sprint Spectrum L.P. v. Willoth,176 F.3d 630, 645 (2d Cir. 1999) (quoting 300 Gramatan Ave. Assocs. v. State Div. Of Human Rights, 45 N.Y.2d 176, 181, 408 N.Y.S.2d 54, 379 N.E.2d 1183 (1978)).

In reviewing a zoning board's decision, the Court must view the record in its entirety, including evidence opposed to the Board's view, and "may neither engage in [its] own fact-finding nor supplant the Town Board's reasonable determinations." Town of Oyster Bay, 166 F.3d at 494. When evaluating whether a denial was supported by substantial evidence, "local and state zoning laws govern the weight to be given the evidence." Id. Thus, while the TCA governs the "procedural requirements that local boards must comply with in evaluating cell site applications" the applicable substantive standards are the "established principles of state and local law". Id. (citation and internal quotation marks omitted).

Here, the applicable local law is Section 68-420.1(A) of the Town Code, which sets forth objective requirements and subjective considerations for obtaining a special use permit to construct a telecommunications facility. In reviewing an application for a special use permit, "[a]lthough the board retains some discretion to evaluate each application, to determine whether applicable criteria have been met, and to make common sense judgments as to whether the application should be granted, such determination must be supported by substantial evidence". Omnipoint Commc'ns v. Town of LaGrange, 658 F. Supp. 2d 539, 558 (S.D.N.Y. 2009) (citing Twin County Recycling Corp. v. Yevoli, 90 N.Y.2d 1000, 1002, 665 N.Y.S.2d 627, 628, 688

N.E.2d 501 (1997)).  Moreover, the Court notes that T-Mobile relies fairly heavily on the Staff

Report's conclusion that the Proposed Facility met the requirements in the Town Code.  Because

the Board is the final decisionmaker on whether to approve a wireless carriers special use permit

application, the Board "has the authority to reject the findings of fact and recommendation of its

hearing staff".  Green Island Assocs. v. Adirondack Park Agency, 178 A.D.2d 860, 861, 577

N.Y.S.2d 722, 724 (3d Dep't 1991).  Nevertheless, "[a]lthough the [Board] was not necessarily

bound by the staff report, New York law is clear that a municipal board must base its decision on

evidence in the record that would be sufficient to support a denial of the application."  Nextel

Partners, Inc. v. Town of Amherst, 251 F. Supp. 2d 1187, 1198 (W.D.N.Y. 2003) (citing Asma v.

Curcione, 31 A.D.2d 883, 298 N.Y.S.2d 286 (4th Dep't 1969)).

      With respect to the applicable state law, because in New York wireless providers such

as T-Mobile are afforded the status of public utilities for the purposes of zoning applications, see

Cellular Tel. Co. v. Rosenberg, 82 N.Y.2d 364, 604 N.Y.S.2d 895, 624 N.E.2d 990 (1993), their

applications are reviewed under the "public necessity" standard established in Consolidated

Edison Co. v. Hoffman, 43 N.Y.2d 598, 403 N.Y.S.2d 193, 374 N.E.2d 105 (1978).  To establish

public necessity in the context of a substantial evidence claim, a carrier must demonstrate that:

"(1) its new construction 'is a public necessity in that it is required to render safe and adequate

service'; and (2) 'there are compelling reasons, economic or otherwise, which make it more

feasible'".  Omnipoint Commc'ns, Inc. v. City of White Plains, 430 F.3d 529, 535 (2d Cir. 2005)

(quoting Rosenberg, 82 N.Y.2d at 371–72, 604 N.Y.S.2d 895, 624 N.E.2d 990).  This has been

interpreted in the context of zoning decisions for wireless facilities to require that the

telecommunications provider establish: "[1] that there are gaps in service, [2] that the location of

the proposed facility will remedy those gaps and [3] that the facility presents a minimal intrusion

on the community".  Site Acquisitions, Inc. v. Town of New Scotland, 2 A.D.3d 1135, 1137, 770 N.Y.S.2d 157, 160 (3d Dep't 2003).

New York law affords public utility status to wireless carriers so that, "[a] zoning board of appeals has a narrower range of discretion in dealing with special permit applications filed by utilities than is true in the case of the generality of applications."  Town of Lagrange, 658 F. Supp. 2d at 555 (citing Omnipoint Commc'ns, Inc. v. Common Council of City of Peekskill, 202 F. Supp. 2d 210, 222 (S.D.N.Y. 2002)).  As a general rule, if the public utility makes the required showing, which necessarily means the record is devoid of substantial evidence to support a denial, the variance must issue.  Town of LaGrange, 658 F. Supp. 2d at 555.  On the other hand, "[i]f the Court finds that even one reason given for the denial is supported by substantial evidence, the decision of the local zoning body cannot be disturbed."  New York SMSA L.P. v. Town of Oyster Bay Zoning Bd. of Appeals, No. 08–CV–4833, 2010 WL 3937277, at *4 (E.D.N.Y. Sept. 30, 2010).

As set forth below, a review of the record reveals that a reasonable mind could conclude that the impact of the Proposed Facility was more than "minimally intrusive" based on evidence that the 120-foot monopole, which would be located in a pristine parkland and visible from a number of streets and residences, was not in the nature and character of the surrounding area and would have a negative aesthetic impact on the scenic view of the Sans Souci Nature Preserve and Sans Souci Lakes enjoyed by residents in the community.

Furthermore, even assuming that the objective evidence of a negative aesthetic impact was insufficient to constitute substantial evidence under the more lenient standard afforded to public utilities under New York law, the Court finds that, when balanced against the Board's finding that the increase in service provided by the Proposed Facility was predominantly in

"passive areas", there can be no dispute that the Board's Denial of the Application was supported

by substantial evidence.  Accordingly, the Court denies T-Mobile's motion for summary

judgment with respect to its claim that the Denial violated section 332(c)(7)(B)(iii) of the TCA,

and grants the Defendants' cross-motion for summary judgment to dismiss the substantial

evidence claim.

### 1. Aesthetic Considerations

"[I]n New York, aesthetics can be a valid ground for local zoning decisions."  Cellular

Tel. Co. v. Town of Oyster Bay, 166 F.3d 490, 495 (2d Cir. 1999) (citing Suffolk Outdoor

Advertising v. Hulse, 43 N.Y.2d 483, 402 N.Y.S.2d 368, 373, 373 N.E.2d 263 (1977)).

Although a reviewing court would not normally "look far beyond [a local board's] citing of

aesthetics to find a valid basis for a local zoning decision, ... under the TCA, a reviewing court

can find that aesthetics qualify as a permissible ground for denial of a permit only if ... there was

'more than a mere scintilla' of evidence before the [local board] on the negative visual impact."

Id. (quoting Universal Camera v. NLRB, 340 U.S. 474, 477, 71 S. Ct. 456, 95 L. Ed. 456

(1951)).

Three of the Board's five grounds for denying the Application were premised on the

adverse aesthetic impact of the Proposed Facility.  Specifically, the Board's second reason for

denying the Application was that the Proposed Facility "was not in keeping with the nature and

character of the area" and its fifth reason for denying the Application was that "[t]here were

significant adverse aesthetic impacts to nearby residential properties".  Furthermore, although

not clearly stated in the Denial, the Defendants assert that the Board's third reason for denial

based on the Proposed Facility's "impact on park uses" included "the public's use of the Sans

Souci Lake Preserve, and whose ability to enjoy its natural and undisturbed beauty would be substantially and deleteriously impacted."  (Defs.' Opp. at 9.)

As an initial matter, T-Mobile argues that, because the Board did not articulate specific objections or cite any evidence in the Denial itself, the aesthetic concerns were necessarily "generalized" and therefore unsupported by substantial evidence.  In support of this contention, T-Mobile cites to an unpublished decision from the District of New Jersey, which was not provided to the Court.  The Defendants do not cite to any contrary authority.  Although the Court's research reveals no binding precedent from the Second Circuit, there is a Circuit split with respect to what information must be included in the written decision.  See Helcher v. Dearborn County, 595 F.3d 710, 717–18 (7th Cir. 2010) (collecting cases).  However, most courts have found that "a decision 'in writing' is adequate if it provides an explanation that allows [the court], in combination with the written record, to determine if the decision is supported by substantial evidence."  Id. at 719; Second Generation Props., L.P. v. Town of Pelham, 313 F.3d 620, 629 (1st Cir. 2002) ("Local zoning boards are lay citizen boards, and while their decisions must be in writing, the boards need not make extensive factual findings in support of their ultimate decision.").  Here, the Court does not need to dig through the record to determine the rationale for the Board's decision.  Not only were the aesthetic objections raised by members of the community in testimony and letters, but they were summarized in the Bayport Civic Association submissions, the Staff Report, and by two members of the Board at the Decision Hearing.

T-Mobile mainly argues that a denial on aesthetic grounds is not supported by substantial evidence because: (1) it is not based on the Town Code; (2) there was insufficient evidence from which the Board could conclude that the Proposed Facility would create more than a "minimal

intrusion on the community"; and (3) there is no evidence that more feasible options existed that were less intrusive on the community. The Court will address these objections in turn.

### a. Whether the Denial Violates the Town Code

T-Mobile argues that a Denial based on aesthetic grounds cannot be supported by substantial evidence because it was not based on any requirements in the Town Code. In making this argument, T-Mobile focuses predominantly on the objective setback and design requirements in the Town Code. However, this argument ignores the remaining aspects of the Town Code, which: (1) state a preference for locating cell towers in commercial and industrial districts rather than in residential districts; (2) give priority to applications for collocation and towers that are being built on existing structures; (3) require that "due consideration" be given to "existing land uses and development, environmentally sensitive areas [and] aesthetics"; and (4) require the Board to consider a number of factors relating to the nature and character of the area including: "proximity to residential districts and other structures"; "nature of existing or proposed uses of adjacent property"; "site and/or surrounding topography"; and "surrounding tree coverage and foliage". These additional considerations authorized the Board to consider the aesthetic impact of the Proposed Facility on the residents directly as well as the nature and character of the community.

Similarly without merit is T-Mobile's contention that, by including the construction of wireless facilities as a permitted use in a residential district, the Board was precluded from finding that the Proposed Facility would have an adverse impact on the community. As a general rule, "inclusion of the permitted use in the ordinance is tantamount to a legislative finding that the permitted use is in harmony with the general zoning plan and will not adversely affect the neighborhood". Retail Property Trust v. Bd. of Zoning Appeals of Town of

Hempstead, 98 N.Y.2d 190, 195, 764 N.Y.S.2d 662, 666, 774 N.E.2d 727, 731 (2002) (citation omitted). Nevertheless, the Board is entitled to deny a special permit if "reasonable grounds exist for its denial, *e.g.*, that the use, although permitted, is not desirable at a particular location". Holbrook Assocs. Dev. Co. v. McGowan, 261 A.D.2d 620, 621, 690 N.Y.S.2d 686, 687 (2d Dep't 1999); see, e.g., Brady v. Town of Islip Zoning Bd. of Appeals, 65 A.D.3d 1337, 886 N.Y.S.2d 465 (2d Dep't 2009); Omnipoint Commc'ns, Inc. v. Town of Islip Planning Bd., 20 Misc.3d 1108(A), 866 N.Y.S.2d 93 (Table) (N.Y. Sup. 2008).

In recognition of the multitude of factors concerning the siting of wireless facilities, the Town has broadly written the applicable ordinance to allow a case-by-case determination of whether, although generally permitted in a residential zone, "a particular location" within that zone is "not desirable". Thus, contrary to T-Mobile's assertion, the fact that the Town included wireless facilities as a permitted use in a Residential zone is "by no means determinative" with respect to whether "the permitted use is in harmony with the general zoning plan and will not adversely affect the local community". Sprint Spectrum L.P. v. Willoth, 176 F.3d 630, 645–46 (2d Cir. 1999) (quoting WEOK Broad. Corp. v. Planning Bd. of Lloyd, 79 N.Y.2d 373, 383, 583 N.Y.S.2d 170, 592 N.E.2d 778 (1992)).

Accordingly, as long as the record contains objective evidence of an actual adverse aesthetic impact on the surrounding community, the Board was well within its authority under the Town Code to deny the Application an aesthetic grounds.

### b.  Whether the Denial on Aesthetic Grounds Is Supported by Objective Evidence

As discussed in greater detail in the facts section, T-Mobile submitted studies, photographs, photosimulations and expert testimony on the aesthetic impact of the Proposed Facility, including, but not limited to:  (1) a One-Mile Study that found that the Proposed Facility

would be at least partially visible from only three locations within a one-mile radius of the Premises, (R. at 770); (2) a "Leaf-Off" Analysis concluding that, even in the winter, the Proposed Facility "would not result in significant adverse visual impacts", (R. at 392); (3) testimony from MacDonald, the architect, who testified that the 120-foot monopole was designed to "blend in to the surrounding tree[] forest" and that, due to the design and setback from the nearest property line it would be "difficult to see" (R. at 514–15); (4) testimony from Duffy, the planner, who testified that the tower would "blend with the horizon" and that the "overall and potential visual impact would not be significant" (R. at 540); and (5) testimony from Lynch, the real estate appraiser, who testified that the design and location of the Proposed Facility significantly shielded it from nearby residences and therefore would not negatively impact property values.   T-Mobile argues that "the evidence presented by the opposition constituted of nothing more than general statements and uniformed speculation", and therefore the Denial on these grounds was not supported by substantial evidence.  (Pl.'s Opp. at 16.)  The Court disagrees.

Objections on aesthetic grounds must "articulate specifically how the proposed cell sites would have an adverse aesthetic impact on the community."  Cellular Telephone Co. v. Town of Oyster Bay, 166 F.3d 490, 495 (2d Cir. 1999).  To deny a siting application on aesthetic grounds, there must be substantial evidence:  (1) that "residents will be able even to see the antennae" and (2) there will be an actual "negative visual impact on the community".  Id.  It is well-settled that a "few generalized expressions of concern with 'aesthetics' cannot serve as substantial evidence on which the Town could base the denials."  Id. at 496.

Speculative concerns about the "potential visibility" of a proposed tower are unlikely to constitute substantial evidence for denying an application absent some form of objective support

in the form of "photographs, site plans, surveys, and the like".  Green Mountain Realty Corp. v. Leonard, 688 F.3d 40, 2012 WL 3234407, at *10 (1st Cir. 2012); Omnipoint Commc'ns, Inc. v. Village of Tarrytown Planning Bd., 302 F. Supp. 2d 205, 222 (S.D.N.Y. 2004) (holding that the "the complaints of a small number of residents at the public hearings about possible visual impacts in the immediate neighborhood of the site or the surrounding national historic district" constituted "unsubstantiated community objection to aesthetics" and therefore was "not sufficient evidence by itself to support the Planning Board's denial").  With respect to the aesthetic impact, because "it would be a rare event to be able to buffer a communications tower so that it is not visible at all," OPM-USA-Inc. v. Bd. of County Com'rs of Brevard County, 7 F. Supp. 2d 1316, 1324 (M.D. Fla. 1997), and "[f]ew people would argue that telecommunications towers are aesthetically pleasing", courts tend to require objective evidence of a negative visual impact that is "grounded in the facts of the case".  Southwestern Bell Mobile Sys. v. Todd, 244 F.3d 51, 61 (1st Cir. 2001).  In the Second Circuit, this can be established through "aesthetic objections raised by neighbors who know the local terrain and the sightlines of their own homes."  Omnipoint Commc'ns, Inc. v. City of White Plains, 430 F.3d 529, 534 (2d Cir. 2005).  Other evidence can include "beautification efforts" or the "actual character of the immediate neighborhood."  T-Mobile Central, LLC v. Unified Gov't of Wyandotte County, 546 F.3d 1299, 1312 (10th Cir. 2008).

    In assessing whether the record contains substantial evidence supporting the Board's denial of the Application on aesthetic grounds, the Court is guided by the Second Circuit's decision in Omnipoint Communications, Inc. v. City of White Plains, 430 F.3d 529 (2d Cir. 2005).  In City of White Plains, Omnipoint sought to construct a wireless facility with a 150-foot tower.  Omnipoint submitted evidence in the form of photosimulations that it contended showed

that a proposed 150-foot tower "would be invisible or unnoticeable outside of the golf course" in which it was to be built.  Id. at 532.  The town board questioned the accuracy of the visual impact analysis in light of the fact that "residents were not invited to participate in the study, or notified of it".  Id.  In opposition, residents testified that the proposed tower would be "50 feet taller than the tallest deciduous trees in the landscape", that "the tower would be an eyesore", and that the tower "would impair the view from [a local temple's] glass-enclosed chapel".  Id.

The residents also retained experts.  One expert testified that "a 150–foot tower cannot effectively be disguised as an evergreen in a neighborhood where the tallest evergreen is just 51 feet high", and "[o]ther experts testified on the neighbors' behalf regarding the anticipated diminution in property values".  Id.  The board denied the application for, among other reasons, the "adverse visual impact" created by the proposed tower.  Id. at 533.

The district court granted summary judgment to Omnipoint on the ground that the board improperly credited "the unsupported fears of local residents, whose views can only be based on speculation since (1) they have never seen the monopole (as it has not yet been built), and (2) they propounded no countervailing photo simulations of their own" over Omnipoint's expert study that concluded that "the visual impact would be minimal".  See Omnipoint Commcn's, Inc. v. City of White Plains, 175 F. Supp. 2d 697, 716 (S.D.N.Y. 2001).  On appeal, the Second Circuit reversed the district court, holding that:

> Given the 150–foot tower would rise to three times the height of the tallest evergreen tree and would be half again as tall as any other tree in the area, the Board could reasonably conclude (especially given express testimony to that effect) that the tower would be widely visible. In addition, the Board received substantial evidence of the tower's adverse aesthetic impact. We have no difficulty concluding that the Board's rejection was based on reasonable and substantial evidence.

430 F.3d at 533.

Here, the 120-foot tower, by T-Mobile's own analysis, would be twice as high as the surrounding trees. T-Mobile's own photographs show that the tower would be visible from a number of streets and from the Montauk Highway, and the "Leaf-Off" Analysis reveals increased visibility during the winter. T-Mobile's architect did not deny that there would be increased visibility in the winter, but rather stated that, because the tower would be painted brown, "in the winter you may see more of a brown pole". (R. at 526.) As the Staff Report noted that, even with adding trees on the streets with the most substantial view, it would not completely eliminate the view. In fact, the Staff Report emphasized that "[t]he surrounding tree foliage, albeit not completely, blocks much of the view of tower from the residences *nearby*". (R. at 681 (emphasis in original).)

T-Mobile argues that the One-Mile Radius Study revealed that the tower would only be visible from three locations in a one-mile radius of the Premises. However, there was sufficient evidence in the record for the Board to doubt this conclusion. For example, during Duffy's presentation, one of the Board members questioned the accuracy of the photograph from a street view approximately 1,235 feet southeast of the subject site that purported to show that the Proposed Facility would not be visible insofar as it was taken from a "heavily wooded front yard". (R. at 537–38.) Duffy replied that she could not "say one way or the other, but it is possible" that the Proposed Facility would be visible from that resident's backyard. (R. at 538.)

Furthermore, the Bayport Civic Association supported its objection to the sufficiency of the "Leaf-Off" Analysis by submitting three photographs from a resident taken during the second crane test, which showed that over half of the tower would be visible during the winter from three nearby residential locations. T-Mobile made no effort to distinguish or discredit the resident photographs before the Board, or in its submissions to this Court. One of the resident

31

photographs appears to have been taken from the same intersection as one of T-Mobile's photosimulations, the intersection of Renee Drive and Barton Lane.  In the resident's photograph, the crane is significantly more visible.  (Compare R. at 166 with R. at 395.) Although the resident photograph showed the crane and not the camouflaged monopole, based on the photosimulations, it would not be unreasonable for the Board to discredit Duffy's conclusion that, even painted brown, a "pole" towering 60 feet above the nearest trees would not "visually blend with the horizon".

Thus, as in City of White Plains, the visibility of the tower from nearby residences and streets was far from speculative.  Indeed, the fact that T-Mobile's photosimulations, the resident photographs, and the Staff Report all conclusively demonstrate that the top of the tower would be visible from nearby streets, makes the evidence in this case arguably stronger than that in City of White Plains, where Omnipoint attempted to argue that the tower "would be invisible or unnoticeable outside of the golf course".

T-Mobile contends that a "communications facility being proximate to a residential area is an insufficient ground upon which to deny a special exception permit application, especially where the impact on the surrounding community is negligible".  (Pl.'s Opp. at 17.)  However, the Court notes that the case T-Mobile cites for this proposition,  Group EMF, Inc. v. Coweta County, 50 F. Supp. 2d 1338 (N.D. Ga. 1999), was actually citing to OPM-USA-Inc. v. Board of County Commmisiors of Brevard County, 7 F. Supp. 2d 1316 (M.D. Fla. 1997), where the court rejected the argument that a proposed tower would "be totally foreign to the natural and community aesthetics of the residential neighborhood" as not supported by substantial evidence where the "evidence demonstrate[d] that . . . there [were] two other towers within view."  Id. at 1324.  Here, the undisputed evidence in the record is that the Proposed Facility would be twice

as high as the surrounding trees, and T-Mobile did not present any evidence that there were other towers nearby that had a similar impact on the scenic views from the Town.

Furthermore, the record in this case contains objective evidence that the visible tower would have more than a "negligible" or "minimal" impact on the community. As the Second Circuit noted in City of White Plains, when considering the impact on the community, a zoning board can consider community opposition in the form of "aesthetic objections raised by neighbors who know the local terrain and the sightlines of their own homes." 430 F.3d at 534. In City of White Plains, this included testimony by neighbors that "the tower would be an eyesore" and arguments from a nearby temple that the tower "would impair the view from its glass-enclosed chapel". Id. at 532.

Similarly, the record in this case includes aesthetic objections from a resident who lived "approximately 410 [feet] from [the Proposed Facility]", who stated "In the wintertime from my house I can look almost completely across Lake Sans-Souci, so I will have a great view of this pole in the wintertime". (R. at 620.) Another resident who lives on Cinque lane, near the location where T-Mobile's photosimulations show that the tower would be visible, argued his property values would decline. Although a significant portion of his testimony involved health concerns, he also objected to the aesthetic impact, comparing the placement of the Proposed Facility within the view of his home to "put[ting] a dump across the street". (R. 638–39.) Another resident who drives on Montauk Highway, where one of T-Mobile's photosimulations show the tower would be visible, testified it would "damage the aesthetic view on the approach on Montauk . . . looking over the Sans Souci Lakes". (R. 630–31.).

It is interesting to note that, despite the fact that City of White Plains is directly on point, and heavily relied upon by the Defendants, T-Mobile does not even attempt to distinguish it from

the facts of this case, or explain why it should not guide the Court's decision. In fact, in the three briefs submitted by T-Mobile on the instant motions, the only reference to City of White Plains is a "cf." citation for the meritless argument that "no residents identified themselves as neighbors whose terrain and sightlines would be directly affected" by the Proposed Facility. (Pl.'s Reply at 8.)

Instead, T-Mobile argues that the facts in this case are similar to those in Town of Oyster Bay, where the Second Circuit found that the general statements of only a few residents who expressed their concern with aesthetics and their uninformed speculation on the visual nature of the proposed monopole did not constitute substantial evidence. Id. at 495–96. Unlike the facts in Town of Oyster Bay, the record in this case reflects that there was no confusion as to what the Proposed Facility would look like; the Town Code included a stated preference for avoiding placement of wireless facilities in residential districts and environmentally sensitive areas; the record contained specific and informed statements based on objective evidence on the incompatibility of the proposed 120-foot tower to the nature and character of a residential community; and there was testimony from residents who purchased homes in part due to the scenic views of the Sans Souci Nature Preserve and pristine parkland.

In addition, T-Mobile's comparison of the record in this case to that in New Cingular Wireless PCS, LLC v. Town of Fenton, 843 F. Supp. 2d 236 (N.D.N.Y. 2012) does not lend support to its contention that the Proposed Facility was "more feasible" than other options because it was "minimally intrusive". Although T-Mobile, like the service provider in Town of Fenton, "went to considerable lengths to minimize the visual impact of its proposed facility", there is substantial evidence in the record to support the Board's conclusion that T-Mobile did not go far enough. Id. at 248. Furthermore, the proposed facility in the Town of Fenton was not

located near a nature preserve, and there did not appear to be any testimony about the impact of the facility on the nature and character of the area. Rather, the court noted that "[t]here [was] only one specific complaint about the visual impact of the proposed cell tower in the record". Id. at 151. By contrast, the record in this case contains statements and letters from multiple residents, the Bayport Civic Association, and a New York State Assembly member specifically complaining about the negative aesthetic impact of the Proposed Facility, which were objectively supported by photosimulations and testimony by residents with knowledge of the local terrain and direct sightlines of the tower.

Further supporting the Board's denial on aesthetic grounds is the Town Code itself. While the Town may have included the construction of wireless facilities in residential zones as a permitted use, the Town Code states an express preference for collocation; placing wireless facilities in commercial or industrial zones "rather than in residential districts"; and giving due consideration to "environmentally sensitive areas". Although there is no evidence in the record to dispute T-Mobile's evidence that the Proposed Facility would have a minimal if any impact on the environmental conditions of the surrounding area and the proximate wetlands, it was not unreasonable for the Board to consider a wireless facility only 125 feet from wetlands—which is within the fall zone of the tower—to be an "environmentally sensitive area".

By including these priorities in the Town Code, the Town "made clear" that protecting residential districts and environmentally sensitive areas was "an objective of [the Town] when considering cell tower applications". Wireless Towers, LLC v. City of Jacksonville, Fla., 712 F. Supp. 2d 1294, 1304 (M.D. Fla. 2010) (holding that the defendant's denial of the plaintiff's application to build a wireless facility in a nature preserve on aesthetic grounds was supported by substantial evidence where the plaintiff's photo simulations, supported by the testimony of a

resident, showed that the proposed facility would have an adverse visual impact on the surrounding area, and the applicable local law "ma[de] clear that protecting the viewshed of environmentally sensitive lands such as the Preserve [was] an objective of the City when considering cell tower applications.").

In T-Mobile Central, LLC v. Unified Gov't of Wyandotte County, 546 F.3d 1299 (10th Cir. 2008), the Tenth Circuit found that a zoning board's denial of T-Mobile's siting application on the ground that the applicable town code included a preference for placing towers in commercial districts rather than residential districts was not supported by substantial evidence because the town had failed to consider facts in the record regarding the "actual use of the surrounding property", including admissions by the town that the "neighborhood is somewhat commercial in nature" and that there are only a "few residential uses in the general area." Id. at 1311.

By contrast, in this case, T-Mobile's own expert stated that "[t]he surrounding area is characterized by a camp ground, nature preserve and residential uses". (R. at 530.) As the record reflects, with the exception of a few turn of the century homes, all of the residential and commercial buildings in the neighboring community are one or two stories in height, including the Fire Department and the local high school. Speaking on behalf of the residents, the President of the Bayport Civic Association, Robert Draffin, stated:

> The scenic vista overlooking the Sans-Souci Preserve will be forever disturbed. The nature and character of the hamlet of Bayport will be irreparably scarred by allowing a structure to be built 400 percent taller than any other structure in the town, a town that built itself up on single-story and two-story dwellings.

(R. at 700.) Also included in the record is: a letter from residents describing beautification and preservation efforts by the Town and the county to preserve the natural state of the areas

surrounding Camp Edey; a letter from a resident stating that he had grown up in the area and purchased his home based on the scenic views of the Sans Souci Nature Preserve, which would be permanently altered by a 120-foot monopole that was twice the size of the surrounding trees; and a letter from a member of the New York State Assembly written on behalf of "many constituents" who had contacted her regarding the Proposed Facility, stating that "A structure of this size would not be in keeping with the aesthetics of Bayport" (R. at 142).

Where, as here, resident objections that a proposed tower would interfere with scenic views and the nature and character of the community are supported by actual evidence that the proposed tower is visibly obtrusive, courts commonly find that the denial of a wireless application on aesthetic grounds is supported by substantial evidence. See, e.g., Green Mountain, 2012 WL 3234407, at *10–*11 (holding that a board's denial on aesthetic grounds satisfied the substantial evidence requirements where it relied on objective evidence including: "plans indicating that, although there are some existing utility poles on the site, the proposed tower, at 140 feet, would be more visible than everything already in place"; "photographs of the crane tests conducted by Green Mountain and residents' testimony about those tests to measure the visual impact of the proposed tower"; "statements from the Friends of the Blue Hills describing the effect of the tower on views from that historic state park", and evidence that "indicated that the tower would be visible from at least four different locations within the 8,000–acre Reservation"); Helcher v. Dearborn County, 595 F.3d 710, 724 (7th Cir. 2010) ("The photographic representations of the tower as viewed from the property of . . . neighbors, accompanied by the objections of many residents who purchased land and built homes in this area specifically because of the natural views, provided the Zoning Board with substantial evidence to reject the permit."); Sprint PCS Assets, L.L.C. v. City of Palos Verdes Estates, 583

F.3d 716, 726 (9th Cir. 2009) (finding substantial evidence supporting denial of permit where the city council reviewed "mock-ups of the proposed [wireless facilities] and a report that detailed the aesthetic values at stake," as well as public comments, and concluded that the tower would "detract from the residential character of the neighborhood"); SiteTech Group Ltd. v. Board of Zoning Appeals of Town of Brookhaven, 140 F. Supp. 2d 255, 262 (E.D.N.Y. 2001) (holding that a zoning board's denial of a wireless facility siting application on aesthetic grounds was supported by substantial evidence where the record included "testimony by residents and members of civic, historical, and senior citizen organizations, sufficiently knowledgeable as to the historic heritage and nature of the community and the prevailing architecture and appearance of the immediate and surrounding area and community, and the incompatibility of the proposed monopole with that historic nature and heritage and prevailing architecture and appearance.").

Based on the evidence in the record, and the stated preferences in the Town Code, a reasonable mind could conclude that, although located in a residential zone, because the Premises is pristine parkland abutting a nature preserve, the Proposed Facility would be more than "minimally" intrusive. In preserving the authority of local governments over wireless siting applications, Congress determined that local governments, not their staff, the service providers, or the courts, were the parties best suited to make this subjective determination for their communities. In finding that the Proposed Facility would have more than a "minimal" impact on the community, the Board, like the board in City of White Plains, acted within its discretion in choosing between "the observations of self-interested neighbors" and "an expert study submitted by a self-interested applicant". 430 F.3d at 534.

### c. Whether Aesthetic Concerns can Overcome T-Mobile's Evidence that "More Feasible" Options did not Exist

Finally, T-Mobile argues that a denial on aesthetic grounds is not supported by substantial evidence because "[t]here are no available locations that are further removed from residences and that would also be capable of serving the Coverage Gap." (Pl.'s Opp. at 16.) In support of this proposition, T-Mobile cites to the Staff Report's conclusion that "[g]iven the nature and character of the area, it would be difficult to site this tower in an area that would be less obtrusive". (R. at 682.)

On a substantial evidence claim, where there is more than a "minimal intrusion or burden", the telecommunications carrier must show 'compelling reasons why the proposed request is more feasible than other options". Genesee Telephone Co. v. Szmigel, 174 Misc.2d 567, 570, 667 N.Y.S.2d 588, 590 (N.Y. Sup. 1997). The Court does not deny that T-Mobile ruled out a number of alternative locations identified by both T-Mobile engineers and the staff of the Planning Department. In fact, "[T-Mobile] may even be entitled to a presumption that its proposed tower[] [is] necessary given that it has considered and rejected alternatives." Willoth, 176 F.3d at 647.

However, a number of courts have held that a negative aesthetic impact is alone sufficient to uphold the denial of a siting application, without any consideration of existing alternatives or the wireless carrier's "need" for the facility. See, e.g., SiteTech Group Ltd. v. Bd. of Zoning Appeals of Town of Brookhaven, 140 F. Supp. 2d 255, 263 (E.D.N.Y. 2001) ("Based on the determination that the BZA's denial on the ground of aesthetics is supported by substantial evidence, this Court need not address whether the BZA's denial of the special use permit on the grounds of impairment of property value and alternative sites were supported by substantial evidence."); Sprint Spectrum L.P. v. Bd. of Zoning Appeals of Town of Brookhaven, 244 F. Supp. 2d 108, 115 (E.D.N.Y. 2003) (Spatt, J.) ("Because the Court finds that aesthetics provided

a valid basis to deny the application, the Court need not address whether the BZA's denial of the special use permit on the grounds of impairment of property value and failure to comply with the Town's set back requirement were supported by substantial evidence."). Thus, it would appear that the absence of an alternative site "that would be less intrusive" is not in and of itself a "compelling reason" to find that the Proposed Facility is "more feasible" than other options under the public necessity standard.

Moreover, "[w]hen evaluating the evidence [supporting the Denial], local and state zoning laws govern the weight to be given the evidence" and the Act does not "affect or encroach upon the substantive standards to be applied under established principles of state and local law." Cellular Tel. Co. v. Town of Oyster Bay, 166 F.3d 490, 494 (2d Cir. 1999). Here, the Town Code does not state how the factors set forth within should be weighed. Thus, while T-Mobile and the staff of the Planning Department appeared to heavily weigh the "availability of suitable existing towers and structures" and "proximity to residences" considerations under the Town Code, the Board was free to give greater weight to the preference against placing a wireless facility in a residential or environmentally sensitive area, the nature and character of the neighborhood, and the aesthetic impact of the tower.

The only limit on the Board's ability in this regard is set by the TCA's restriction that municipalities cannot deny applications that would result in the effective prohibition of wireless services, which requires that certain allowances be made where there is a "need for service" that cannot be closed by "less intrusive means". Willoth, 176 F.3d at 647. In this case, T-Mobile does not assert that its need was so great that a denial based on aesthetic considerations constitutes a prohibition of wireless service. As the Second Circuit noted in Willoth, "mandating approval of all wireless facilities would act as a disincentive for wireless service providers to

develop and deploy new technology that will provide better transmission and reception with less intrusive towers, effectively undermining the TCA's goal of increased innovation." Id. at 640. The fact that T-Mobile may have a need for the Proposed Facility does not "trump all other important considerations, including the preservation of the autonomy of states and municipalities". Id. at 639.

Furthermore, in this case, the absence of a specific viable alternative is even less compelling. The record reflects that, after complying with the objective requirements of the Town Code, T-Mobile focused its search on possible sites based on its belief that the "proximity to residences" consideration in the Town Code would ultimately guide the Board's analysis. Indeed, at the Hearing, counsel for T-Mobile explained to the Board that "ours is a difficult job because if we would put the site closer to houses, I am sure you would be shouting at us that it was an inappropriate location. So we have to put our engineering needs with the needs of the town to avoid visual obtrusiveness." (R. at 554.) As a result, T-Mobile acknowledged that other unspecified locations "on any of the lots lying within the commercial and industrial areas along Montauk Highway", may be capable of addressing the coverage gap, but summarily dismissed them as less "favorable", because they were a greater distance from residences. (R. at 38.)

Similarly, the Staff Report highlighted the distance of the Proposed Facility from residences, and that "many commercial and industrial sites have less distance, with less screening from homes than the proposed site", in concluding that "the applicant has demonstrated that no existing tower, structure, or building can accommodate the applicant's proposed antenna as required for by [sic] the Town Code". (R. at 678.) Accordingly, the Staff Report, like T-Mobile, premised its conclusion that the Proposed Facility was the only available

option based on its elevation of the "proximity to residences" consideration in the Town Code over the aesthetic factors.

Here, the record reflects that the Board found that, in this particular case, "proximity to residences" was a less important consideration than the fact that the Premises is pristine parkland surrounded by a nature preserve:

> For those of us who do zoning work and sit on planning boards know that residential zones are not only constituted by residences. In fact, in the Town of Islip, our residential zones include things like churches, schools and indeed parks. So when we talk about the nature and character of Camp Edey, it being a residential zone . . . When we focus too much on the fact that it is a certain proximity from residences, I think we are really selling short the fact that it is a residential zone, and residential zones have many more components other than residences.
>
> This is clearly a residential zone which includes pristine parkland. When we look at it in that vein, I think the argument that it does not fit the nature and character becomes a lot more detrimental to the applicant. I don't see how anyone can make the argument that [a] 120-foot monopole fits in a beautifully pristine forested area. And that is a residential zone despite the fact that there are no residences.

(R. at 724–25.)

Thus, a reasonable inference from the record is that sites that are closer to residences, even those that are in a residential zone, may have been more palatable to the community than one located in an area of pristine parkland. See City of White Plains, 430 F. 3d at 536 (holding that Omnipoint did not meet its burden of showing that the proposed facility was "more feasible than other options", where there was an option for co-location available that surfaced during the damages trial in the district court, and, although the "more feasible" alternative was "not in the Board's administrative record, it was an available inference from the facts presented to the Board.").

The Court sympathizes with T-Mobile's frustration over what appears to have been a costly and time-consuming exercise in futility. However, as the First Circuit noted in <u>Town of Amherst v. Omnipoint Communications Enterprises, Inc.</u>, 173 F.3d 9 (1st Cir. 1999):

> Ultimately, we are in the realm of trade-offs: on one side are the opportunity for the carrier to save costs, pay more to the town, and reduce the number of towers; on the other are more costs, more towers, but possibly less offensive sites and somewhat shorter towers. Omnipoint may think that even from an aesthetic standpoint, its solution is best. But subject to an outer limit, such choices are just what Congress has reserved to the town.
> . . .
> The substantial evidence test applies to the locality's own zoning requirements, and [the town] has framed those requirements so they may be hard to fulfill unless the Board exercises its judgment favorably to the applicant. But this in turn makes [the town] more vulnerable to a claim, based on experience, that its regime is an effective ban. Thus, the two federal limitations—one dealing with bans and the other with substantial evidence—complement one another by ensuring that local law is both fair and is fairly administered.

<u>Id.</u> at 15–16.

Although T-Mobile complains that the Town Code created an unfair "Catch-22 scenario", it made no direct challenge to the constitutionality of the statute, nor did it argue that the application of the statute resulted in the effective prohibition of wireless services. Here, the Board's denial on aesthetic grounds was based on the preferences and subjective considerations in the Town Code, and was supported by objective evidence of the tower's visibility as well as the negative aesthetic impact on the surrounding community. Where, as here, there are grounds for denial other than generalized community objections, "deference must be given to the discretion and commonsense judgments of the board" and "[w]here substantial evidence exists, a court may not substitute its own judgment for that of the board, even if such a contrary

determination is itself supported by the record".  Retail Prop. Trust, 98 N.Y.2d at 196, 746 N.Y.S.2d at 666, 774 N.E.2d at 731.

Accordingly, the Court finds that the Board's denial on aesthetic grounds, as stated in reasons two, three, and five of the Denial was supported by substantial evidence.

## 2.  Need for Service

The Defendants assert that their decision was supported by substantial evidence because: (1) T-Mobile failed to meet its burden of showing the existence of a "coverage gap" and (2) the purported coverage gap was predominantly in "passive areas".

### a.  As to the Existence of a Coverage Gap

In their motion for summary judgment, the Defendants argue that T-Mobile cannot establish a coverage gap because there is insufficient data in the record to show that a coverage gap exists.  T-Mobile contends that the Defendants are precluded from making this argument because the existence of the coverage gap was not cited by the Board as a reason for denying the Application.  The Court agrees.

"A board may not provide the applicant with one reason for a denial and then, in court, seek to uphold its decision on different grounds."  Nat'l Tower, LLC v. Plainville Zoning Bd. of Appeals, 297 F.3d 14, 21 (1st Cir. 2002); Preferred Sites, LLC v. Troup Cnty., 296 F.3d 1210, 1220 n. 4 (11th Cir. 2002) (stating that a Board could not create reasons to support substantial evidence after the commencement of the action and that the Board must present their denial reasons in a written record.); see also Nextel of New York, Inc. v. City of Mount Vernon, 361 F. Supp. 2d 336, 342 (S.D.N.Y. 2005) ("Defendants also argue that its decisions were in part the result of concerns about adverse aesthetic impacts.  However, these considerations were not mentioned in the City's written decisions, and cannot be raised now.").

Absent from the written Denial, or the Administrative Record, is any evidence, let alone substantial evidence, questioning the sufficiency of T-Mobile's data. Rather, the record reflects that, after extensively reviewing T-Mobile's initial and supplemental submissions, the Planning Department concluded that a "significant amount of coverage is gained in justifying this proposal". (R. at 681.) In addition, at the Decision Hearing, the chairman of the Board concurred, stating "It is my position, anyway, in this particular situation, there is clearly a lack of coverage here. The lack of coverage is shown and demonstrated by the maps that were submitted, and show that there is no cell phone signal in particular areas". (R. at 726.) As discussed below, the Court does not deny that, in order to take advantage of the more lenient standard of review afforded to public utilities, T-Mobile was required to establish a need for its service. However, the record reflects that the Board considered whether T-Mobile had provided sufficient data showing the existence of a coverage gap, and found no fault with the adequacy of the evidence presented. Thus, this new position is a post-hoc rationalization that is outside the purview of the Court's consideration on a substantial evidence claim. Accordingly, the Defendants' argument that T-Mobile failed to establish the existence of a coverage gap is not supported by substantial evidence.

**b.    As to the Abundance of Coverage in "Passive" Areas**

In its written decision, the Board found that T-Mobile had "failed to establish a need for service within the coverage gap" because the "abundance" of the coverage gap consisted of "passive areas where wireless communications service is not needed". T-Mobile argues that a Denial on this ground is not supported by substantial evidence because it is not based on the Town Code.

The Town Code provides that relevant considerations when determining whether to issue a special use permit for a wireless facility include that the Proposed Facility is "[t]he minimum height necessary to render adequate service" and the "[a]vailability of suitable existing towers and structures". Absent from the Town Code is any definition of "adequate service", or any requirement that an applicant show a "need" for service in order to obtain a special use permit to construct a wireless facility. Even assuming an applicant was required to show a "need for service", there is no provision in the Town Code that distinguishes between "active" and "passive" areas, nor is there any stated requirement that a particular percentage of a service gap must be in "active" areas before the Board will issue a special permit to construct a wireless telecommunications facility in a residential zone. Accordingly, a denial solely on this ground cannot be supported by substantial evidence.

Nevertheless, the Board argues, and the Court agrees, that, to the extent T-Mobile asserts that it was entitled to the more lenient standard of review on the Application because of its status as a public utility, the Board had the right to consider T-Mobile's "need for the facility". In this regard, the amount of service actually provided is relevant to the "need" inquiry. In <u>Sprint Spectrum L.P. v. Willoth</u>, 176 F.3d 630 (2d Cir. 1999), the Second Circuit provided some guidance with respect to the "need for service" that must be shown on a prohibition claim, stating:

> Where the holes in coverage are very limited in number or size (such as the interiors of buildings in a sparsely populated rural area, or confined to a limited number of houses or spots as the area covered by buildings increases) the lack of coverage likely will be de minimis so that denying applications to construct towers necessary to fill these holes will not amount to a prohibition of service.

<u>Id.</u> at 643–44.

However, where, as here, the carrier does not bring a prohibition claim, there does not appear to be a set rule for the corresponding increase in service that must be provided for a public utility to show a "need" for a wireless facility. Rather, it appears to be a sliding scale, balanced against the intrusion on the community.

While "it has long been held that a zoning board may not exclude a utility from a community where the utility has shown a need for its facilities . . . this has never meant that a utility may place a facility wherever it chooses within the community." Matter of Consolidated Edison v. Hoffman, 43 N.Y.2d 598, 610, 403 N.Y.S.2d 193, 374 N.E.2d 105 (1978). "Although a municipality is not free to prevent a utility from providing necessary services by application of its zoning powers, neither may a utility simply disregard the local ordinances." Zagoreos v. Conklin, 109 A.D.2d 281, 289, 491 N.Y.S.2d 358, 364 (2d Dep't 1985). "Rather, a balance must be maintained between those interests of the locality which can be expressed by zoning ordinances and the needs of the community which must be served by the utility." Id.

Thus, under New York law, "the fact that the applicant is a utility calls for a balancing of interests", Cellular Telephone Co. v. Rosenberg, 153 Misc.2d 302, 308, 581 N.Y.S.2d 554, 558 (N.Y. Sup. 1992), where the service needs of the utility are balanced against the intrusion on the community. Hoffman, 43 N.Y.2d at 611, 403 N.Y.S.2d 193, 374 N.E.2d 105 ("where the intrusion or burden on the community is minimal, the showing required by the utility should be correspondingly reduced."); see Genesee Telephone Co. v. Szmigel, 174 Misc.2d 567, 667 N.Y.S.2d 588, 570 (N.Y. Sup. 1997) ("The size of the tower and the impact on local residences place this matter beyond a minimal intrusion or burden. That being the case, it is incumbent upon Cellular One to show compelling reasons why the proposed request is more feasible than other options."); cf. Vertical Broad v. Town of Southampton, 84 F. Supp. 2d 379, 393 (E.D.N.Y. 2000)

("Nonetheless, even public utilities are not granted a right so broad as to create an entitlement under Federal law. While the local governing body must consider the need for the facility and balance that need against the intrusion to the community, there remains still local discretion sufficient to defeat the entitlement claim").

Indeed, other courts have held that under the TCA, "[a] reasonable decision whether to approve a permit to construct a cellphone tower requires the local government to balance the contribution the tower would make to the availability of cellphone service against the detriments the tower presents to the surrounding community." Helcher v. Dearborn County, 595 F.3d 710, 723 (7th Cir. 2010); cf. Sprint Telephony PCS, L.P. v. County of San Diego, 543 F.3d 571, 580 (9th Cir. 2008) ("A certain level of discretion is involved in evaluating any application for a zoning permit. It is certainly true that a zoning board *could* exercise its discretion to effectively prohibit the provision of wireless services, but it is equally true (and more likely) that a zoning board would exercise its discretion only to balance the competing goals of an ordinance—the provision of wireless services and other valid public goals such as safety and aesthetics.").

As one court has noted "[s]uch a policy-based decision is precisely the type of decision Congress left to local zoning boards." Voice Stream PCS I, LLC v. City of Hillsboro, 301 F. Supp. 2d 1251, 1259 (D. Or. 2004) ("Coupled with the city's aesthetic judgment is the fact the proposed tower would not fill a complete void in coverage but instead would only improve indoor or, in plaintiff's term, "urban" coverage. In determining whether the tower would be in the "public interest," the city was within its authority to weigh the benefit of merely improving the existing coverage against the negative aesthetic impact the tower would cause.").

The record reflects that the Board engaged in precisely this type of balancing. Specifically, in addition to citing both the "abundance of passive areas" and the negative

aesthetic impact as grounds for denying the Application, the record also includes statements from

the Board reflecting that it engaged in this balancing of interests. For example, at the Hearing,

when questioning T-Mobile about the passive areas, one Board member stated:

> I am looking at a risk/benefit analysis off the top of my head
> and I see a vast majority of the coverage area in an area of no roads
> and no houses, and I don't see who will be using their cell phones
> there.

(R. at 553.) Furthermore, in explaining his basis for opposing the Application at the Decision

Hearing, one member of the Board stated:

> It is my understanding that when an applicant seeks to put up a
> cell tower such as this there is requirement that they show that
> there is a gap in service and that this proposed tower will fill that
> gap in service. In my opinion, you have a very high percentage of
> passive area, or area for this cell tower which doesn't provide any
> service; it is open hand; it is wooded area, pristine parkland.
>   Also, this proposal has obviously a very adverse effect on the
> aesthetics of this residential and pristine area, the parkland. Even
> including this red light that is now going to go on top of this
> proposed cell tower.

(R. 110–11.)

While T-Mobile now argues that the Board improperly considered certain areas as

"passive", and that it is equally important to increase service in the alleged passive areas, T-

Mobile did not make these arguments to the Board, and they are not otherwise a part of the

record. Rather, at the Hearing, T-Mobile's expert agreed that "[a] major portion of [the

coverage] is within the park". (R. at 553.) In answering questions from the Board, counsel for

T-Mobile did not dispute that the main benefit of the Proposed Facility would be "in-vehicle

coverage". Furthermore, when a Board inquired as to whether a lot of the "in-vehicle coverage"

was "already covered with the other [T-Mobile facilities]", counsel for T-Mobile responded "To

the north.  The object of this site is to carry that southward."  (R. 553–54)  Finally, in the Staff

Report, the Planning Department identified five areas as "passive" and concluded:

> Of the indoor-use coverage gained by the proposed tower, 78%
> is within a passive area where cell phone use would presumably
> not be needed, however 267 acres of area will be serviced; for
> outdoor and in-vehicle coverage, 41% would lie within a passive
> area with 545 acres being serviced.

(R. at 681.)  After the Staff Report was read into the record at the Decision Hearing, T-Mobile

did not object to these areas being identified as "passive", nor did it object to the percentages

identified as "active" versus "passive".

Furthermore, although alternative sites were not suggested by the Board, a reasonable

inference from the record is that other sites may exist to service the "active" portion of the

coverage gap.  The Staff Report noted that the Proposed Facility was "less than ideal", but

ultimately concluded that "the applicant has demonstrated that no structure or building can

accommodate the applicant's proposed antenna that provides similar coverage to the proposed

tower".  (681, emphasis added)).  However, there is no indication that either T-Mobile or the

Planning Department staff considered whether an alternative site existed to provide coverage to

that portion of the "in-vehicle" coverage gap that was not already covered by existing facilities.

Moreover, the record in this case contains a coverage map indicating that placing a tower

at the Bayport Fire Department would provide service to the portion of the active "in-vehicle"

coverage gap not already serviced by T-Mobile facilities, and T-Mobile admitted that placing a

tower on the Bayport Fire Department was a possibility.  (R. at 832, 839.)

In order to find that the Board's denial was supported by substantial evidence, the Court

does not need to determine precisely what percentage increase in coverage corresponds to the

level of intrusion that would be caused by the Proposed Facility.  This policy decision is left to

the discretion of the Board.  That T-Mobile, the staff of the Planning Department, or even the Court may not have reached the same conclusion is ultimately irrelevant to whether the Board's decision was supported by substantial evidence.  In the context of assessing what evidence a "'reasonable mind' would find adequate to support a particular finding or conclusion" the Second Circuit has recently noted that "[c]ommentators have suggested . . .that it might be more appropriate to refer to a 'reasoning mind' rather than a ' reasonable mind' because the inquiry requires evaluation of the judgment used arriving at a finding or conclusion, not the ultimate correctness—or "reasonableness" of that finding." <u>Dyncorp Intern. v. Director, Office of Workers' Compensation Programs</u>, 658 F.3d 133, 137–38 (2d Cir. 2011) (citing Steven Alan Childress & Martha S. Davis, Federal Standards of Review § 15.04 (3d ed.1999)).

Here, the Court has already found that there was substantial evidence to support the Board's conclusion that the Proposed Facility would have an adverse aesthetic impact on the community.  It was not unreasonable for the Board to weigh the intrusion on the community against the evidence on the record—the only evidence the Court is permitted to consider—of the limited benefit of the Proposed Facility, particularly when other less intrusive options may be available to service the "active" areas of the coverage gap.

Accordingly, when considered with the substantial evidence in the record of the negative aesthetic impact of the Proposed Facility, the Court finds that the Board's denial on the ground that T-Mobile failed to establish a "need for coverage" was also supported by substantial evidence.

### 3.  Other Grounds

Based on the determination that the Board's denial of the Application on the grounds of aesthetics and a need for service were supported by substantial evidence, this Court need not

address whether the Board's denial of the special use permit on the grounds of impact on other park uses or aviation concerns were also supported by substantial evidence.  Nevertheless, for the sake of completeness, the Court's review of the record demonstrates that the Board's denial on these additional grounds are unsupported by substantial evidence.

           **a.  Impact on Park Uses**

In addition to the "enjoyment of the park", the Defendants also assert that the Proposed Facility would impact park uses by posing a danger to children trespassing on the Girl Scout's property.  In support of this contention, the Board cites to testimony by two residents at the Hearing that, regardless of the fact that it was trespassing, they frequently witnessed children playing in the park.  Even assuming the Board could deny the Application based on illegal uses of the park, this decision would not be supported by substantial evidence.

It is undisputed that the Proposed Facility would only occupy approximately 1,300 square feet, or .03% of the Premises, and T-Mobile submitted undisputed expert evidence regarding the safety of the Proposed Facility itself.  Furthermore, Girl Scout representative, Yvonne Grant, testified that the Facility would be far removed from areas where children play, campsites or homes, and that the Girl Scouts would be willing to take measures to ensure that individuals were prohibited from entering the surrounding area.  (R. at 574–75.)  Finally, the chairman of the Board himself assured residents at the Hearing that there was no need for them to be concerned about children "in the general area of the pole" because "we will come up with some appropriate means to keep them out".  (R. at 616.)

Thus, the Court does not need to conclusively determine whether a wireless facilities' impact on illegal park uses is a valid consideration for denying a siting application because the undisputed evidence in the record shows that any safety concerns were speculative. Accordingly,

denying the Application on the ground that it would negatively impact the ability for individuals to use the park, as opposed to their use and enjoyment of the scenic view, is not supported by substantial evidence.

### b. Safety Concerns

Finally, the Board's fourth reason for denying the Application based on safety concerns regarding the proximity of the Bayport Aerodome was not supported by substantial evidence.

The traffic pattern for the Bayport Aerodome is 600-feet above ground level, and the proposed tower is only 120-feet high. The record shows that the FAA conducted an aeronautical study, and determined that the Proposed Facility "would not exceed obstruction standards and would not be a hazard to air navigation." (R. at 820–822.) Although the Defendants now object to the fact that the record does not contain the information T-Mobile presented to the FAA, submission of this information was neither required by the Town Code, nor was it requested by the Board. Rather, at the Hearing, the Board directed a resident to contact T-Mobile if he was interested in obtaining the underlying data.

Furthermore, even assuming that the FAA was not familiar with the type of aircraft that utilized the Bayport Aerodome, the same cannot be said of the Town's own Department of Aviation, which, after reviewing "the drawings, and the site plan for the cell tower at Camp Edey", concurred with the FAA's conclusion that the Proposed Facility "is not an obstruction to both Long Island MacArthur Airport and particularly the Bayport Aerodome". (R. at 214.) In an abundance of caution, the Town's Department of Aviation, as well as the Staff Report, recommended including a "red obstruction light" on the tower, in the event that individuals operate planes at unauthorized times or in unauthorized weather conditions.

Although the Board was not required to retain its own experts, the speculative concerns of residents, even a former FAA inspector that has flown over the Premises from the Bayport Aerodome over 500 times, cannot overcome the statements by the FAA and the Town's own Department of Aviation—both uninterested parties—that the Proposed Facility did not pose a hazard to planes flying to and from the Bayport Aerodome.

There is no doubt that the Board's conclusions regarding safety were heavily influenced by a recent plane crash involving a plane that departed from the Bayport Aerodome. As one newspaper article in the record notes, that crash was the second plane crash in five years, the other occurring immediately after take-off. The types of planes that are flown from the Bayport Aerodome may increase the likelihood of plane crashes generally, but the concerns that the Proposed Facility increased that danger were speculative. The Court cannot presume, in the absence of evidence otherwise, that the FAA and the Town's own Department of Aviation would have approved the Proposed Facility if it posed a danger to airplanes flying to and from the Bayport Aerodome. See Petersburg Cellular Partnership v. Board of Sup'rs of Nottoway County, 205 F.3d 688, 698–99 (4th Cir. 2000) ("While we agree that a plane hitting the tower would present a serious problem, we do not believe that there is any rational basis to conclude that such a crash would be likely. While the initial proposal did not include a light on the tower and therefore might legitimately have tended to support this fear, 360° Communications subsequently agreed to put a light on the tower, and the FAA approved the tower with a light on it. In addition, the tower height of 199 feet and proximity of two miles to the airstrip are not a reasonable basis for fear of a plane crash. We cannot presume, in the absence of evidence otherwise, that the FAA would approve this tower if its proposed site posed a risk of it being hit by airplanes.); AT & T Wireless PCS, Inc. v. City of Chamblee, 10 F. Supp. 2d 1326, 1331–34

(N.D.Ga.1997) (holding that denial of an application for a 140 foot tower was not supported by substantial evidence where the generalized concerns of a few citizens that the tower would interfere with helicopter traffic were speculative); Group EMF, Inc. v. Coweta County, 50 F. Supp. 2d 1338, 1350 (N.D. Ga.1999) ("The Board's denial did not reconcile or discuss the evidence presented by Group EMF that the tower met all FAA regulations and would not present a safety risk to the airport. Viewing the record in its entirety, therefore, the Board's denial on this ground is not supported by substantial evidence in the written record. The only evidence regarding safety issues originated from the generalized and unsubstantiated concerns of the airstrip owner. . . . In light of the thorough unrefuted evidence presented by the applicant, the generalized concerns of the owner of the private pasture landing strip do not constitute substantial evidence to support a denial of Group EMF's application.").

Accordingly, the Court finds that the denial of the application based on safety concerns arising from the Proposed Facility's proximity to the Bayport Aerodome were not supported by substantial evidence.

## E.  Article 78

Article 78 of the New York Civil Procedure Law and Rules provides that a party is entitled to relief from a local zoning decision that is "arbitrary and capricious" or is not supported by substantial evidence.  N.Y. CPLR §§ 7803(3) and (4) (McKinney 2008).  Although "Article 78 imposes its own requirement that local decisions be supported by substantial evidence" the test for relief from a zoning board's decision under Article 78 "'is essentially the same as that under the TCA.'"  T-Mobile Northeast LLC v. Town of Ramapo, 701 F. Supp. 2d 446, 461 (S.D.N.Y. 2009) (quoting Omnipoint Commc'ns, Inc. v. Common Council of City of Peekskill, 202 F. Supp. 2d 210, 226 (S.D.N.Y. 2002)).

Having found that the Board's denial was supported by substantial evidence under the TCA and applicable state and local law, the Court finds that the denial was also supported by substantial evidence and was not arbitrary and capricious in violation of Article 78.

### III. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED**, that T-Mobile's motion for summary judgment is DENIED, and it is further

**ORDERED**, that the Defendants' cross-motion for summary judgment dismissing the complaint is GRANTED, and it is further

**ORDERED**, that the Clerk of the Court is directed to close this case.

**SO ORDERED.**
Dated: Central Islip, New York
September 21, 2012

_____/s/ Arthur D. Spatt_____
ARTHUR D. SPATT
United States District Judge